IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARK GLAGOLA**, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 1:21-01230-JMC |
| **TRANSWESTERN DEVELOPMENT COMPANY**, *et al*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Mark Glagola brings this breach of contract action related to his work performed for Defendant Transwestern Development Company and Defendant TDC Logistics Company. (ECF No. 6). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 43, 44). The Court has reviewed the parties' respective motions and replies (ECF Nos. 47, 48) and finds that no hearing is necessary. Loc. R. 105.6 (D. Md 2021). As set forth more fully below, Plaintiff's Motion for Summary Judgment (ECF No. 43) is GRANTED, and Defendants' Cross-Motion for Summary Judgment is DENIED (ECF No. 44).

**I.     BACKGROUND**

The following facts are not in dispute. In fact, the parties agree that no material facts are in dispute, and that the Court should rule on these motions as a matter of law. (ECF No. 43-1 at 8; ECF No. 48 at 1).

Plaintiff performed real estate broker services for non-party Transwestern Commercial Services ("TCS") pursuant to a Qualified Real Estate Agent Agreement that characterized Plaintiff as an independent contractor. (ECF No. 43-6). In accordance with that agreement, Plaintiff's compensation consisted of the payment of commissions for his services on various TCS projects.

*Id*. On occasion, Plaintiff also performed services for affiliated but legally separate companies, including Defendant Transwestern Development Company, LLC, and Defendant TDC Logistics Company, LLC (collectively, "TDC"). (ECF No. 43-2 at 1). Plaintiff was neither an employee of nor contractor for TDC. *Id*. When Plaintiff performed services for TDC, he would earn commissions pursuant to his Qualified Real Estate Agent Agreement with TCS.[1] *Id*. at 2.

In addition to his commissions from TCS, Plaintiff would sometimes ask for or be offered opportunities to invest in the TDC projects for which he performed services as an "accredited investor" through private placement offerings (usually through an investment in a so-called "single purpose entity" set up for a specific project), entitling him to receive a percentage of profits from those projects in return for his investment. *Id*.; ECF No. 44-1 at 3-4. Such arrangements were done on a project-by-project basis, where the rights and responsibilities of the parties were spelled out in: (1) an Offer letter; (2) Private Placement Memorandum; (3) Subscription Agreement; and, (4) Operating Agreement for the investment entity established for a project. *Id*. TDS also apparently offered additional opportunities for its employees and contractors who, unlike Plaintiff, did *not* meet the criteria for "accredited investor" to nonetheless share in the profits of a project through a separate arrangement called a "shared appreciation right" ("SAR"). (ECF No. 44-1 at 3). Prior to the projects at issue, all of Plaintiff's participation in TDC projects was as an accredited investor. (ECF No. 43-2; ECF No. 44-1 at 4).

In 2018, Plaintiff was involved in some capacity[2] with helping TDC enter a joint venture with the California State Teachers' Retirement System ("CalSTRS"), resulting in two projects:

---

[1] In such cases, TDC apparently reimbursed TCS for commissions. (ECF No. 44-1 at 6).
[2] The parties disagree about exactly how much of a role Plaintiff played in helping the joint venture come to fruition, although neither points to this as a material dispute, nor does the Court view it as determinative of any material issue in the case. *See* ECF 44-1 at 6 ("While the Defendants do not share [Plaintiff's] views regarding his relative contributions to securing the Penn Commerce deal and *know* that he had nothing whatsoever to do with securing the Condor deal that difference of opinion is irrelevant.") (emphasis in original).

Penn Commerce and Condor. (ECF No. 43-2 at 2-3). Plaintiff was paid a commission of $250,000 by TCS per his Qualified Real Estate Agent Agreement. (ECF No. 44-1 at 6). However, because of the projects' structure, CalSTRS itself made the investment to develop the projects and there was no investment opportunity for TDS or, correspondingly, Plaintiff. (ECF No. 43-1 at 11-12; ECF No. 44-1 at 7). Instead, CalSTRS agreed to pay TDC a cash Project Success Bonus if the projects were successfully developed. (ECF No. 43-1 at 11).

Plaintiff anticipated participating in some fashion in Penn Commerce, Condor, and future CalSTRS projects. (ECF No. 43-2 at 2-3). For its part, though not previously discussed, TDC notified Plaintiff that he would at least be sharing in the success of the Penn Commerce project, as set forth in the following email from TDS's President, Carleton Riser, to Plaintiff, sent August 2, 2018:

> Thanks for working it. Also, we have not discussed but I am going to dial you in for a piece of the promote on Penn Comm. You did great work and we did not have equity to allocate. I'll circle back next week.

(ECF No. 43-8). After some months delay, whatever "piece" Plaintiff was going to get on the Penn Commerce project had still not been finalized, resulting in an email from Plaintiff to TDC Logistics' Managing Partner, John Thomas on April 15, 2019, as to Penn Commerce, Condor, and any additional projects with CalSTRS, wherein Plaintiff made the following proposal:

> I am requesting:
> - For Penn Commerce 10% of the proceeds that will be distributed to partners
> - For Condor CA – 2%
> - Ongoing dialogue and updates regarding the relationship.  If I talk to them, I report to you. If you or your team does, you update me. And as we can, we talk to them together.
>
> Let me know.  Let's move towards more important issues.

(ECF No. 43-11).

In response to Plaintiff's email, TDC discussed internally whether it should fold Plaintiff's participation in Penn Commerce and Condor into a broader agreement (which it called the "MLP Plan") or whether it would instead "work on a one off plan on these two deals…." (ECF No. 43-12). Further, TDC internally discussed Plaintiff's specific proposed percentages for both projects, noting that it had already paid Plaintiff's commission but conceding that, had this been a more typical deal where the client had not put up the investment itself, Plaintiff would have been offered an investment opportunity. (ECF No. 43-13).

Ultimately, no MLP Plan was ever proposed and TDC did not formally make a "one-off" proposal for Penn Commerce and Condor, causing Plaintiff to again follow up with TDC on May 28, 2019. (ECF No. 43-15). TDC again discussed this internally, confirming that Plaintiff would have had some investment opportunity if CalSTRS had not fronted the investment for the projects itself. (ECF No. 43-17). TDC also confirmed that it would be treating these two projects (and any others that came along prior to execution of a more comprehensive MLP Plan) as "one-offs." (ECF No. 43-18). Following a phone call with Plaintiff, TDC memorialized the following proposal as to Penn Commerce, Condor and any future CalSTRS projects by email on May 29, 2019:

> Mark—as a follow up to our conversation let this memorialize the deal
> Penn Commerce Phase One  - 5%
> Penn Commerce Phase two – If we end up being the developer then 5% as in Ph1; assuming we sell the land only, we will determine the correct amount of participation give (sic) the final results
> Condor Road Project – 2%
> Confirm agreement and I will send to our accounting group and Cindi Trapp for their records.

(ECF No. 43-21).  Later that day, Plaintiff confirmed:

> Thank you John
> This is acceptable
> Let's talk more frequently. Let's figure out the next deal asap.

(ECF No. 43-22).

4

Internally, TDC forwarded Plaintiff's acceptance email to its accounting department to "prepare appropriate documentation," but because neither project had the typical investment opportunity, TDC was not sure if "SAR documentation [wa]s appropriate." (ECF No. 43-23).

Ultimately, on May 30, 2019, TDC's Riser decided that no further documentation was necessary, stating "[t]his will be our revenue to distribute so [accounting] should not have to do anything. I'd just document with a memo to [Plaintiff] that also triggers some notation with our accounting team." (ECF No. 43-24). Plaintiff was never sent any additional documentation of the agreement.

In September of 2020, Plaintiff and TCS agreed to terminate their Qualified Real Estate Agent Agreement. (ECF No. 43-2 at 6). Pursuant to its terms, Plaintiff and TCS also agreed to a list of projects from which Plaintiff would receive post-termination commissions. (ECF No. 43-25 at 3). For its part, TDC's accounting department sent Plaintiff correspondence outlining his remaining private placement investments for those projects that had an investment component. (ECF No. 43-26). TDC was silent as to Penn Commerce and Condor. *Id*. When Plaintiff followed up as to those projects, TDC's accounting department indicated that it was only dealing with projects with an investment component, not "fee projects" like Penn Commerce and Condor. *Id*.

This exchange apparently prompted TDC to internally discuss whether its May 29, 2019, agreement with Plaintiff as to Penn Commerce and Condor contained a condition precedent that any payments to him required his continued employment. TDC noted that in projects involving SARs (which these did not), continued employment is required either for full vesting (if an investment opportunity such as one offered for nonaccredited investors) or continued payment (if there is no vesting component). (ECF No. 43-27). Tellingly however, TDC's Riser asked, "[d]oes someone have a copy of the document/s that [Plaintiff] signed so we are not speculating about

5

what it says?" *Id*. After finding the emails constituting the May 29, 2019, agreement with Plaintiff, TDC's Thompson observed in pertinent part:

> I found this but it is silent as to whether he needs to be here to participate. Also, he is now a competitor so we need to keep that in mind. Cindi the concept was an SAR concept, what do our standard SAR's say about being here to participate?

(ECF No. 43-28).

On November 9, 2020, TDC sent the following email to Plaintiff, for the first time raising the SAR language requiring continued employment for participation in projects where an SAR is in place, but acknowledging that no SAR was in place for either Penn Commerce or Condor:

> Mark I did some research on your question and I learned that we never issued a formal SAR document to you. Regardless you should understand that our standard SAR document between the Commercial services employees and TDC is very clear that in order to qualify for payment you must be a current employee at the time of liquidation.

(ECF No. 26).

No payments to Plaintiff for the CalSTRS projects were ever made. In December of 2021, TDC received its Project Success Bonuses for Penn Commerce Phase 1 of $24,472,405, and for Condor of $5,504,754. (ECF No. 31). If Plaintiff's interpretation of the agreement is correct, he is entitled to 5% ($1,224,620.25) for Phase 1 of Penn Commerce, and 2% for Condor ($110,095). Phase 2 is currently pending and the Success Bonus not yet paid, but TDC is the developer such that, if Plaintiff is correct, he would be due 5% of the Success Bonus for Phase 2 as well.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant it entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree that that there is no genuine dispute as to any material fact, and that this matter should be decided by the Court as

a matter of law. (ECF No. 43-1 at 8; ECF No. 48 at 1). However, the parties each argue that their interpretation of that law entitles them to summary judgment.

### III. ANALYSIS

#### a. Maryland Law Applies

A court sitting in diversity applies the choice of law rules of the forum state, which, in this case, is Maryland. *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). For breach of contract claims, Maryland applies 'lex loci contractus', utilizing the law of the state where the contract was formed unless the parties contractually agree to some other state's law. *State Auto. Mut. Ins. Co. v. Lennox*, 422 F. Supp. 3d 948, 961 (D. Md. 2019). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 790 A.2d 720, 728 (Md. Ct. Sp. App. 2002). "A contract is formed when an unrevoked offer made by one person is accepted by another." *Cty. Comm'rs for Carrot Cnty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Sp. App. 2008).

On May 29, 2019, TDC sent an email to Plaintiff to "memorialize the deal" and set forth the terms by which Plaintiff would be paid from the Penn Commerce and Condor projects, asking Plaintiff to confirm so that he could send the agreement to TDC's accounting group for their records. (ECF No. 43-21). In response, Plaintiff confirmed that the terms were "acceptable" by return email the same day. (ECF No. 43-22). Plaintiff, a citizen of Maryland working out of TCS's Maryland office, confirmed his acceptance in Maryland. Accordingly, the contract was formed in Maryland, and Maryland law on contracts applies in this case.

#### b. Maryland Applies the Objective Theory of Contract Interpretation

The parties agree here that the interpretation of a contract is "ordinarily a question of law for the court." *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 592 (D. Md. 2019). "Maryland courts apply the objective theory of contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Id*. at 592 (citations omitted). In its analysis, a court "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated....[W]hen the language of the contract is plain and unambiguous[,] there is no room for construction, and a court must presume that the parties meant what they expressed." *United States v. Hartford Accident & Indem. Co*., 168 F. Supp. 3d 824, 833 (D. Md. 2016) (*quoting Taylor v. NationsBank, N.A.*, 776 A.2d 645, 653 (Md. 2001)).

"[U]nder the objective theory, a court will only consider extrinsic evidence concerning the parties' intent if it first deems the contract's language ambiguous." *Hartford*, 168 F. Supp. 3d at 833 (citing *Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 277 n. 12 (Md. 2014)). It is not, however, "the province of the court to rewrite the terms of a contract so as to avoid hardship to a party, or because one party has become dissatisfied with its terms." *Maslow v. Vanguri*, 896 A.2d 408, 421 (Md. Ct. Sp. App. 2006).

Applying those principles to the facts of this case, the Court finds no ambiguity in the agreement between the parties. After concluding that Plaintiff deserved to share in the CalSTRS projects but recognizing that they did not present the typical private offering investment opportunity of past projects in which Plaintiff had been involved, TDC told Plaintiff it would be proposing to pay Plaintiff some "piece" of those deals. After negotiations, including discussions about whether the projects would be "one-offs" or part of a larger MPL Plan, TDC

"memorialize[d]" the terms of the parties' "one-off" agreement by specifying the percentages payable on both projects (including addressing the contingency if TDC did not wind up being the developer for both phases of Penn Commerce). (ECF No. 43-21). Plaintiff accepted those terms by return email the same day. (ECF No. 43-22). There is nothing ambiguous about the parties' agreement. Indeed, TDC does not identify any ambiguous language in the agreement so as to justify consideration of the extrinsic evidence they contend is relevant to interpreting the agreement.

The "continued employment" condition that TDC seeks to impose was never part of the agreement negotiated by the parties and is not suggested by any of the wording of the agreement. Indeed, TDC acknowledged that the agreement is silent as to such a provision. As TDC also acknowledged, each project stands on its own, and its terms are governed by the particular agreement and specific associated documents. (ECF No. 43-5 at 16-17). Thus, there is nothing in the agreement that would justify the Court considering "course of dealing" argument to add a new term to the agreement.

Moreover, even if the Court were to consider such evidence, it supports Plaintiff's position, not TDC's. The fact that other unrelated "one-off" projects not involving CalSTRS *or* Plaintiff may have included SARs that incorporate such terms does not render the terms of the May 29, 2019, agreement ambiguous or justify adding such terms as a matter of law. In fact, Plaintiff had not entered into an SAR with TDC for other projects such that he would expect terms from an SAR to be part of this agreement. Similarly, the fact that prior private *investment* offerings that Plaintiff participated in with TDC for other unrelated projects (each with its own documentation) had language that *reduced*, but did not eliminate, continued equity participation post-termination (ECF No. 47-1 at 13) does not support adding such a provision to the May 29, 2019, agreement,

9

which had none of the characteristics or accompanying documentation of the prior investment opportunities in which Plaintiff participated. Further, TDC has argued that even the reduction in participation that was part of prior investment deals with Plaintiff may have been driven more by compliance with securities laws than an intent to incentivize continued employment. (ECF No. 44-1 at 4-5). Thus, TDC was not universal in its prior course of dealing with Plaintiff in tying all project participation payments to continued employment such that Plaintiff should have understood that such a term was part of this new stand-alone agreement regarding the CalSTRS projects.

As further evidence that a continuous employment term cannot be reasonably implied in the agreement, even contemporaneous to Plaintiff's acceptance of the agreement, TDC affirmatively decided that no SAR was necessary for the May 29, 2019, agreement, given the nature of the deal. It was only after Plaintiff left the company and began working for a competitor that, after verifying that such a term was not part of its agreement with Plaintiff, TDC seized on the SAR analogy in an attempt to alter its terms. Clearly, just as it had bargained regarding the percentages of participation, TDC could have tried to bargain for a continued employment condition precedent, whether through incorporating an SAR or otherwise. It did not do so, nor will the Court do so now on its behalf.

### c. The Maryland Wage Payment Collection Act is Not Relevant

As a final matter, the Court will address *Whiting-Turner Contracting Company v. Fitzpatrick*, 783 A.2d 667 (Md. App. 2001), the chief authority TDC relies on for its other main argument—that notwithstanding its agreement with Plaintiff, Maryland wage and hour law gives it the unilateral ability to cancel its own payment obligations. The Court disagrees.

In *Whiting-Turner*, the Maryland Court of Appeals was called upon to interpret Maryland's Wage Payment Collection Act, § 3-501 *et. seq.,* Md. Labor and Employment Code Ann. ("MWPCA"). The MWPCA imposes requirements on employers covered by its terms to pay any unpaid wages (as defined) to a departing employee on or before the date when they would otherwise be due and payable notwithstanding the termination. The specific issue before the Court of Appeals was under what circumstances a "bonus" constituted "wages" for purposes of the MWPCA. Noting that Section 3-501(c) includes "bonus" in the definition of wages, the Court of Appeals nonetheless held that only bonuses "promised for service" as part of the conditions of employment fell under the MWPCA's requirements. *Id*. at 671-672. Thus, it held, in the absence of a promise in advance that a bonus payment was part of an employee's compensation, "it is merely a gift, a gratuity, revocable at any time before delivery" and not covered by the MWPCA's wage payment provisions. *Id*. 673.

*Whiting-Turner* is inapposite to this case. First, Plaintiff has not sued for an MWPCA violation, nor has either party argued that the MWPCA applies to the parties' relationship in this case. Further, TDC agrees that it did not employ Plaintiff nor otherwise have an independent contractor relationship with him like TCS did. (ECF No. 48-4). Rather, vis a vis TDC, Plaintiff is a contractual counterparty. The MWPCA is a special statutory scheme imposing certain statutory obligations on employers vis a vis employees if its conditions and definitions are met. It does not create a general common law outside of its auspices wherein any party promising payment to another party for work performed in any setting can unilaterally renege on its contractual obligations based on whether such payments would, in an employment setting, meet the MWPCA's definition.

Even if the MWPCA did apply, which it does not, it might well cut in Plaintiff's favor. The touchstone for whether promised payments constitute "wages" is whether the work giving rise to the payment was performed prior to termination of the employment relationship. *Medex v. McCabe*, 811 A.2d 297, 302-303 (Md. App. 2002) (incentive payments based on sales goals obtained prior to termination constitute "wages" under the MWPCA). Here, Plaintiff performed the work giving rise to the payments prior to his termination, as TDC acknowledged when it first raised the issue of paying Plaintiff a "piece" based on Plaintiff's "great work." (ECF No. 43-8). Even *explicit* "continued employment" provisions are unenforceable when at odds with the MWPCA's provisions. *See Medex v. McCabe*, 811 A.2d 297, 303-304 (Md. App. 2002) (in upholding employees right to "incentive fees" earned but not yet paid by termination date, Court of Appeals striking continued employment provisions, stating, "[c]ontractual provisions between the parties cannot be use to eliminate the requirement and public policy that employees have a right to be compensated for their efforts").

Accordingly, the Court does not find *Whiting-Turner* or its reasoning applicable to this case, and will not relieve TDC of its obligations to Plaintiff on that basis. Having found the agreement to be unambiguous and enforceable, the Court grants Plaintiff's Motion as to Count I: Breach of Contract.

### d. Plaintiff is Entitled to the Relief He Seeks

The Court turns to the relief sought by Plaintiff. The agreement is clear as to the percentages of the Project Success Bonuses for the CalSTRS projects. Given that Phase I of Penn Commerce has been paid, Plaintiff's 5% share amounts to $1,223,620.25. Further, Condor has been paid, and Plaintiff's 2% share amounts to $110,095.08. Judgment is therefore entered in Plaintiff's favor for the combined amount of $1,333,715.33.

Plaintiff is also entitled to pre-judgment interest on this amount. In Maryland, "[p]re-judgment interest is allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date." *Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001) (quoting *First Virginia Bank v. Settles*, 588 A.2d 803, 807 (Md. 1991). The legal rate of prejudgment interest in Maryland is six percent per annum. *Fed. Sav. & Loan Ins. Corp. v. Quality Inns, Inc.*, 876 F.2d 353, 359 (4th Cir. 1989) (citing Md. Const. art. III, § 57). In this case, TDC's obligation to pay Plaintiff the agreed percentages of the Project Success Bonus for Penn Commerce Phase 1 and Condor became certain, definite, and liquidated on December 14, 2021, which is the date that CalSTRS paid the Project Success Bonuses. As a result, Plaintiff is entitled, as a matter of right, to prejudgment interest calculated at a rate of six percent per annum from December 14, 2021, through the date of judgment according to the following formula: ($1,333,715.33 x .06)/365 = Per Diem amount of $219.24, then multiplied by the number of days from December 14, 2021, through the date this judgment is entered on the docket.

The Court next turns to Count III: Declaratory Judgment. "The Declaratory Judgment Act, 28 U.S.C. § 2201, grants federal district courts the discretionary power to entertain declaratory judgment actions." *First Nationwide Mortg. Corp. v. FISI Madison, LLC*, 219 F. Supp. 2d 669, 672 (D. Md. 2002). "A federal court has discretion to entertain a declaratory judgment action if the relief sought (i) 'will serve a useful purpose in clarifying and settling the legal relations in issue' and (ii) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id*. (quoting *Continental Casualty Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994)).

Phase 2 of Penn Commerce is underway, but TDC has not yet been paid. (ECF No. 43-1 at 26). Because the parties' agreement is clear that Plaintiff is entitled to 5% of TDC's Project Success Bonus on Phase 2 when paid, the Court grants Plaintiff's Motion as to Count III, holding that immediately upon payment of the Project Success Bonus for Penn Commerce Phase 2, TDC shall notify Plaintiff of same and shall promptly pay Plaintiff's 5% share.

Because the Court has granted Plaintiff complete relief in addressing Counts I and III of the Complaint, the Court need not address the remaining counts.

## IV. CONCLUSION

Accordingly, Plaintiff's Motion for Summary Judgment as to Counts I and III (ECF No. 43) is GRANTED. Defendants' Cross-Motion for Summary Judgment (ECF No. 44) is DENIED. A separate order shall follow, after which the Clerk is directed to close the case.

July 25, 2022  
Date

/s/  
J. Mark Coulson  
United States Magistrate Judge